at OWL, and we'll hear from Mr. Zumo. May it please the Court. My name is Patrick Zumo. I represent appellants Zelma Loeb and her company, Loeb Architects. You can speak up. Sorry, Your Honor. I know you're right in front of us, but there's something about the system here. This appeal concerns copyrights in an architectural work, which the statute defines as the design of a building embodied in any tangible means of expression, including architectural plans, drawings, and the building itself. We believe that this case has a common thread, or this appeal this morning has a common thread for the… Can anyone hear in the back? They can't even hear you at Council. I'm sorry, Your Honor. Can you turn up… I mean, what… Do you mind if we get this? Can you turn… Can I do… I don't… I think this… I don't even know if they work, but they're… I think this only turns it up at our deal. I'll just try to… Now it's working, so I think we're okay. Learn something every day. Sorry. There's a common thread. Why again? Another common thread. The common thread in all of the issues before the court today is reading instruments. The license issues turn on how the court construes two written contracts. The DMCA issue turns in part on how the court construes that statute, and the damages for the court reads discovery responses. The final judgment below was based on four motions for summary judgment that the district court granted in two written opinions, and I'm going to address those issues with the court's leave in the same order that the district court did. The first of those issues, in the first of those issues, the district court found that all defendants had an implied license to make and distribute derivative works of the Loeb design in the form of building plans, buildings, and advertisements. The district court reasoned that federal common law meant that Texas law did not govern whether Loeb and Padua Realty agreed to create a non-exclusive copyright license. This court should reverse because there is no federal common law of copyright licenses, and Texas law bars all of the defendants' implied license claims. This court has never held that there's a federal common law of copyright licenses. To the contrary, in the Lularama decision in 1997, the court said Texas law governs our analysis whether the parties contractually created a non-exclusive license. Isn't that a red herring, though? In other words, Lularama is what binds this court. Lularama is pretty clear, saying what you said. It's a matter of contract law to the extent that it's not superseded by the Copyright Act. Your Honor, I don't think we can say it's a red herring because the holding of the district court on this issue was an express statement that Texas law didn't apply because it was in conflict with what the court called federal. Yeah, but if we applied New Jersey law in a case, and it turns out we should have applied Florida law, but they're the same, it doesn't really matter. It's not what we call it. It's what it is, right? They're not the same here, Your Honor. The Texas law of an implied conflict. Well, but relying on our precedent on the subject, how are they different? Well, because this issue has never been before the court squarely as the district court presented it in the district court's opinion. At this point, what the district court said on a matter of law isn't compelling. Lularama is compelling. How do you square your argument with Lularama, which found an implied non-exclusive license? What the court addressed in Lularama involved advertising jingles. There were 29 advertising jingles that were created after the express contract in that case had expired. So what the court found an implied license on was material that was created without an express contract that covered the subject matter. Here, we had two express contracts for the services of my client, the architect, that do directly cover what the architect is going to create, the copyrighted works, and what the defendant's Padua realty can and can't do with them. So here we do have an express contract that directly covers the subject matter of the claim and the subject matter of the alleged implied license. Let me ask you the core. To me, I'm just having trouble with the notion of what the heck the value of this would have been if it wasn't to allow the further, because there's an agreement that you have seven phases, and this was just the first two. There's no contention that somebody could build a building off of this. Now, I know your argument is, oh, they were getting financing package, but that seems to me to be fake. If I'm going to take something I can't use to build my house to go get my mortgage, but it's fake, how is that even possible? Isn't it really that you're working towards that house? And in this case, obviously, their building. So I agree they couldn't go use it for some other building somewhere else, but they're using it for this building. How on earth could your client think, oh, they better not use it for the building. Oh, no, no, no, no. Because that's what the contract says, Your Honor. The financing package in the summary judgment record shows that it is common for architects to prepare drawings that are part of a package that's used to attract investors or financing to show what the project is going to be and whether it's feasible. But they're restricted from being used? I mean, I understand they're used for the financing package, but they cannot be used to build the building? This contract on page 2, the language that the district court said was part of the license that was granted, specifically says in the last bullet point under phase 2 that the architect is going to deliver a set of drawings, of documents, that they can reproduce, scan, or dry mount as needed. That's consistent with using it for a financing package. What we can't do under that reproduce language is prepare derivative works, which is a separate exclusive right of a copyright owner. What about the fact that the designer, not your architect, but the next architect, scrapped your client's design, didn't use it at all? So what's the problem? That is a disputed factor for purposes of our summary judgments. If you look at the sketches, they're not at all alike, the final products. Your Honor, what we provided, what Lowe Architects provided, was a schematic design. It's not meant to be a final design. What they compared those to is a final design after you've done what's called design development and preparation of construction documents, which have all the dimensions and everything. So it's an apples to oranges comparison when you have the very first step in the design process compared to the finished process. But that step wasn't used by the real architect? We contend that it was, Your Honor. And the critical thing is every architect has to start with schematic design. But this Trout Architects never did a schematic design, and no schematic design was ever produced in the lawsuit. Well, no, and the lenders could have sued the owner if the trout design varied in a very significant way from the original schematics. Because their financing is depending on the schematics, is it not? The defendants claimed that they never got any financing for the ultimate development based on the investor packages and finance packages that contained my client's work. And we never saw these other investor packages or finance packages. Yeah, but your client got . . . let me ask this. How does this case differ from the Shaver case? In Shaver, Your Honor, apparently the court found that there was an intent by the architect or designer who prepared those designs that they could be used . . . Well, he made an after-the-fact sort of concession about it. But there were several factors, and the contract itself didn't say anything about . . . it had the similar language about reproduce, but like this contract, it did not follow the AIA form, which would have been explicit. But this contract, Your Honor . . . let me go back to the court's first question on this. Shaver also says, and the district court said, that it was a totality of the circumstances test. That's correct, is it not? Well, it would be if Shaver was Texas law, which we say it's not. Well, it's cited favorably in Lularama, and therefore I would say we're bound by whether if we're wrong on Texas law, we can go en banc. But that's the way we're interpreting it. But the totality of the circumstances in every implied license case that was cited in this case includes the defendant actually using the work. These defendants deny using the work, and they can't at the same time say that what they did was in reliance on what they understood . . . They can assume arguendo for purposes of a summary judgment. That's done all the time. They didn't do that here, though, Your Honor. You're shifting over to the DMCA issue now. Well, no, this is on the license issue, Your Honor. The second thing is, as we showed in our reply brief to the evidence cited by the defendants, Mrs. Loeb never said the defendants could use her schematic design for later phases of the project. That is totally irrational to me. The way this . . . I mean, the Shaver case set this up also. This is standard in the business where you've got multiple phases of a project, and the first couple of them are designs and schematics, but the actual construction drawings follow later on. Didn't she say in her deposition that this is the conventional way to do this and that she, at this point in her experience and practice, was being hired mostly for schematics? What she said in the full record is that many project . . . many developers talk to an architect, get a schematic design, and never go any further. So by definition, most of an architect's work is going to be schematic designs on projects that don't go further. But here, Your Honor, the important thing . . . I thought the evidence was that she knew she wasn't going to be hired for the three to seven. That's . . . she did . . . that's not a correct statement. The . . . she had not yet been hired, but the contract set out that these phases are available for later if they get past the second phase. The important thing, though, Your Honors, is to go to that next phase, to the construction drawings and then to the building. Those are new derivative works. They're not reproduced, identical copies of the schematic design. Each phase becomes a derivative of the previous phase. It's based on it, but there's significant new material that's added. These contracts did not give an express license to create derivative works, whether in the form of construction drawings, advertisements, or buildings. The district court's error is in interpreting this to allow Padua Realty to make additional derivative works that aren't authorized, and then compounded that error by allowing this alleged license to be transferred or used to the benefit of all these other parties. You're starting to run out of time. What is your . . . in your view, what is your best case on this subject, and also what is your best sentence or paragraph in the contract for your position? The contract, Your Honor, is the definition of the word project as used in the contract starting on page one, where it clearly deals with the architect's services, not the physical development. The case, Your Honor, I believe is fantastic fakes because it quotes Manners v. Morosco, a 1920 decision in the United States Supreme Court, that a license reserves to the licensor anything that's not actually licensed. And that principle, that a license means what I allow you to do is what you can do, but I retain all other rights. Those other rights under Section 106 of the Copyright Act include the right to make derivative works and to distribute the copies and derivatives. To answer your question . . . On what basis did you sue the subsequent owners of the project? The subsequent owners are distributing the copies, which are in the form of buildings, by rent or sale. They're buying a piece of real estate. They're not buying drawings. But the buildings that are on the real estate are derivatives of the drawings. We did a little extra research on that, and we found a—if I can find it. Oh, yes. With a patty on copyright at Section 11—for patry on copyright, copyright in the plans alone does not extend to prohibiting unauthorized construction based on the plans, nor may damages be awarded for the sale or other exploitation of a built structure. Your Honor, that was the law. This Court stated it in Imperial Homes. May I finish the answer? Certainly. The Imperial Homes case for this Court was a pre-Architectural Works Copyright Protection Act case. In 1990, Congress amended the Copyright Act to add the category of architectural works, and legislative history shows that the Imperial Homes holding was one of the things they wanted to correct, which is that you could have infringement based on construction of a building from plans and that you could have infringement based on looking at a constructed building and making a copy. I'll give the Court two citations of cases from other— You didn't brief this, did you? It's an architectural works case, Your Honor. Well, I understand that, and I think I recall Imperial Homes being cited, but I don't think this was explored. But you didn't challenge that on appeal, right? Well, we did, Your Honor, because part of our response to the license motion was that it was contrary to the definition of an architectural work, and we've said repeatedly in our brief that there was no license to create derivative works. So I believe we have raised it. So inferentially you challenged the idea. Okay. We'll look at that. If the Court would like, there's a case from the Second Circuit, Schultz Design v. Sard Custom Homes, 691 F3rd 182, 2012, and a case from the First Circuit, Tepeg v. Vermont Timber Works, 459 F3rd 97, a 2006 case. Both courts go into very good detail about the Architectural Works Copyright Protection Act and what an architectural work is and how that 1990 statute changed the protection. Okay, great. Thank you, Your Honor. Thank you. You have time for rebuttal. All right. We'll hear next from Mr. Edmonds. May it please the Court, John Edmonds for the appellees. I'm going to take a slightly different approach with the Court's leave and address the express contract first because that may give the Court its easiest path to affirmance. But whether it's by express or implied, both of those paths work for the Court. With the express license, you can focus on reproducing as desired for the project for which they're made. Where are you looking at that? Looking at the contract. Under Phase 2 is the reproduce as desired language. And on the last page of the contract, and this is either contract, the second bullet point says the documents of the property of the architect, whether the project for which they are made is executed or not. They can't be used for other projects, but that's the project for which they are made. Right. In addition, so to go back, the definition. Do you agree or disagree that it was just for financial issues that you all got this schematic? No, we disagree with that. In fact, it says on page 1, under basis for proposed scope of services, this contract is for Phases 1 and 2 below. And when the contract discusses Phases 1 and 2, it further says, just right below that, that the owner can expect the following phases, Phases 3, 4, 5, 6, and 7. And contrary to what the appellant just said, in Phase 3, there's going to be design development. In other words, changes to this initial schematics. In Phase 4, there's going to be construction. And there's also, I direct the court under the section, and this is on the fourth page of the contract, under Owner-Client Responsibilities,  revisions, design changes made during, revisions are design changes. They're specifically addressed in the contract. So this, what I heard was kind of a pivot on this to say it doesn't cover derivative works. The contracts expressly provide that there is an expectation that there will be changes made during design. And as the appellant. On that building as opposed to some other. I mean, do you agree you can't just use it on some other building? Correct. Because it says you can't use it for other projects. But it could be used for this project. When it defines the project, the project is defined as a senior living project. There's one that's the assisted living and the cottages, and there's one that's the other. But the project is something that is at an address. There are specific buildings. There's a certain number of rooms. Right. So if you went some other place, some other city and used it, then you would agree that was a problem. We agree. But those aren't the facts here. But it was, assuming arguendo, it was used, it was used on this property. Assuming arguendo, and I'll correct another statement. In our summary judgment motion, it said, we dropped a footnote. I don't have the record, but we dropped a footnote in the motion that said we'll assume for the sake of argument that we did. That we did use it. Right. So you can do that in a summary judgment and say, okay, if we did run the traffic light, we still didn't hit him or something like that. And so then you move on to the rest of the summary judgment. That's correct. And more fundamentally, in the Padua Declaration, which was the first exhibit to the summary judgment, it really kind of gets to the nub of this, and that's at ROA 6208, where the owner's program was intended to carry forward. And the program, in other words, where things go, how many of these rooms we want, all kinds of design parameters were intended to carry forward. A fundamental dispute in the underlying case is whether what was carried forward was the owner's program or whether it was what they claimed to be their intellectual property. But that's beside the point with the license. What about the fact that the next architect disregarded these plans, said they scrapped them? Is that true or not? It's absolutely true. They did a redesign. They were paid more than we paid for these to do the redesign. But the claim by the plaintiffs was that, well, even though you did a redesign, you either intentionally or unintentionally must have carried forward something from our design. When was the building finalized? It was finalized, I think, 2016, late 2016. Because apparently Loeb Deffler discovered the alleged infringement, in other words, the use of her plans in 2013, but she didn't sue until 2019. So what was going on for those six years? So when I say finalized, and I may be off on the date, it may have been, but there was what was called a topping out party, which means that we're done here. But it takes a long time to build a project like this. And so she became aware early on in the process that the project had moved forward without her. And that's when she started looking for lawyers early on in that process. But it took years to get the project finished, permitting and all those things for a senior living project. It's a big process. What's your answer to the derivative work argument? So the answer is first that the contract expressly contemplates and allows that in phases three through seven there are going to be changes. The appellant admits, and I think the court doesn't even need an admission, that the hand-drawn sketches provided are not permittable. You can't build something that's a sketch that almost looks almost like a cartoon. So there had to be some kind of changes made necessarily. That's in the contract. And then also if you do get to the implied license issue, then that should be an easy case for, we cited the Lyme Coral case, the Latimer case, asset marketing systems. That's when you, under the totality of circumstances, under Lularama's test, where you hand over these plans without any limits on what can be done with them, then your fellow circuits have said, and then also this was mentioned with approval in a case from this court, the geophysical case, that that brings along all the rights. So that would be to all the rights is all the rights. In addition, just looking at the contract, reproduce as desired is broad. And so the derivative work is something, in other words, if I make an exact copy, that's a copy. If I make something less than an exact copy, that's a derivative work. Reproduce as desired means it includes reproduce in whole or part. So the contract gets you there, the common law gets you there, the case law gets you there, too, if you go to implied license. So the way these two interact is we think it gets you all the way there with the express license. The contract allows construction. It allows PAD or Realty. In fact, it requires PAD or Realty to use others to effectuate the project. So that's the third-party involvement. That one I have a problem with. That's where you were talking about consultants or something? It's in two places. They furnish services for consultants on page four, additional optional services. I don't see that as necessarily contemplating hiring Trout. In fact, I absolutely don't see that. Well, Trout would fall under what are you going to do for phases three through seven? Who's going to be the architect? Who's going to finish it? I know that, but in your brief you said you seem to say that services for consultants was all encompassing later on in the project, and I certainly don't see it that way. At a minimum, it covers the contractor, the others involved with the project. The contractor was one sued. So there's also, in terms of what the owner's responsibility was, also it says it's three bullets, two bullets under that. Any other items or procedures not formally found in the architectural design services, which is also broad. But allowing Trout to finish phases three through seven is what the contract allowed, because it expressly says you can expect that there are seven phases, we're doing one and two, and then, as we can see, someone else did phases three through seven.  And what about your opponent's argument that she was trying to become the three to seven person? And so by saying that, she's not contemplating that there's going to be somebody else, essentially what he said. The district court, I think, correctly found that she proposed to do all seven. That proposal was rejected, and she agreed to do phases one and two. And the district court correctly said, well, that is a strong indication that you're not going to be the one hired to do one through two. But that's very much like the Shaver case that we cite. Sorry, three through seven. And that's very much like the Shaver case, where Shaver said, well, I thought I would get hired for the rest, and the Seventh Circuit said, well, you didn't get hired for the rest.  So what is your best case on the express side, and what is your best case on the implied side? On the express side, I'd prefer the court to Hunn, which is Hunn versus Dan Wilson Holmes. It's also an architectural case. On the implied side, I'd direct the court to Shaver. I'd also direct the court to Geophysical Service versus TGS, which is cited. There's a couple opinions floating around in that, but this is the one that's at 784, Fed Appendix 253. It's unpublished, but it's still available to the court, where they had submitted plans to a Canadian entity or to a Canadian government, and that license extended down into the United States, where, with a geophysical company here, was able to use them. So that's an example from this court about extending the license to its full scope of its coverage. Are we to decide here whether they could sue the owners, the subsequent owners? Are you representing them? I do represent them. And so there's two pathways to get there. One is, under the express license that's provided, there's an express license that, for this project, it covers the project. That's how this was written. So Ms. Loeb, as a copyright owner, has this bundle of rights. She's given up the stick that covers this project. So the new owner, there's nothing to sue the new owner on. The project is licensed. And to think of what the frightening results would be, told otherwise, would be, think of someone's house. I mean, most people use, or a lot of people use architects, at least for new houses, to say that one can't sell their house or the new buyer's going to get sued or one can't rent out their house or they're going to get sued for renting it out. Those are just, that would be an unreasonable reading of this contract. Well, he says the statute was designed to allow that. No, I think what my friend is saying is that originally the Copyright Act didn't cover the building at all, and the Architectural Act came in and said, okay, we're going to cover the building now, too. But it didn't change anything fundamentally or really anything about licensing in terms of whether something's covered by a license or not. And I'd also point out — Well, what's the point of covering the building then? Well, in other words, it used to be that before this Act, if I made a set of plans, somebody couldn't copy the plans, but they could build a building to the plans without a license, and there's nothing I could do to stop it. That's the gap that the statute filled. But it didn't change anything fundamental about copyright or about licensing. And I'd also point out that, as I said at the beginning, anywhere the express license doesn't get you all the way you need to go, the implied license gets you there, because under the cases I cited for you, when the plans are provided without any admonitions that they can't be used for certain things, then that's all the rights. And all the rights means all the rights. You can't come back and sue the next owner or if it gets rented out or something like that. And renting is not a copyright violation. We had a different — and selling is not a copyright violation. Buying is not one either. We had a different summary judgment motion on that, but the court ran it on license. So for your purposes — Well, did they appeal this? Is this issue before us? This issue is not before you. Well, that's what I — I mean, that's what I was sort of — I don't want to — To me, it's as if it may be waived. So I was just — If it went back, then it would come back up on that. But I'm just saying that the — I don't want to imply that renting something is a copyright violation. It's not in the first place. I understand that. But I asked you if it was before us. No. And you should have said no if you thought it was waived. It is not before you. It is not before you. And — but them saying that this is something that they're suing under, it's covered by either the express or the implied license. Both of them get you all the way there. Well, let me ask you another question, then. That is a little bit in tension with Texas law. The tension would be — that if you have an express contract on something, you don't imply other terms. Well, the — I mean, Lula-Rama addresses this correctly, and I understand it's — but it's from this court. Well, it addresses it without highlighting that tension. I mean, it says, you know, there was an implied — that the implied license can coexist with the express license, if I recall correctly. Yes. In fact, I'm quoting from Lula-Rama. It says the owner of a copyright is free to grant multiple licenses for different uses of the same material. And it says the owner can authorize others to use various rights. So in other words, I can expressly license a right, and I can impliedly license other rights. And in addition, when you — when you look at what that language means, when it says the subject, and we've cited a number of those cases, including Woodward from the Texas Supreme Court, that's 384 Southwest 2nd 674. It talks about if there's an inconsistency, then you've got your subject matter conflict. Here there's no inconsistency. They pointed out no inconsistency. In fact, if anything, it's all consistent. So there's no inconsistency. So we don't believe there's a tension with Texas law on that. This is not an AIA form contract, right? That's correct. It's not. Who supplied the contract, the architect or Padua? The record evidence is, and I think it's in our brief we cite to it, she's the author of the contract. We don't think it's ambiguous, but if the court finds it ambiguous, then it's construed against her.  Let me briefly address — does the court have more questions on the contract or on the license issue? If we do, we'll ask them later. Do you want to get to the DMCA? Yes. So there are many cases for the court to borrow from on this issue. But they're all from district courts. They're all from district courts. But the reasoning is good. So the court should follow. And to just draw a picture for what's at stake here, the copyright damages based on the $10,000 in plans are $469 million in this case. That's the damage claim from the profits for the entire project. On the DMCA claim, it's about $3 billion. That's the amount of the penalties they're seeking in the DMCA. So it's something this court should take a look at. What is that $469? I mean, you're screwing the old folks. It's mind-boggling, Your Honor, but they've asked, based upon these hand-drawn sketches for which she was paid, $10,000. They're asking for every cent of revenues from the sale and the rental of this living center for its life. Revenues, not profits. Well, they've taken all the revenues, and their damage expert says we don't recognize any of the offsets, so we want it all. So, yes. Is that what the statute would say if it were a violation? The statute would say profits attributable to the infringement, but their expert says I'm not convinced by any of that, so I want it all. All right. So about $3 billion at stake with the DMCA. The DMCA prohibits someone taking someone else's work and either adding my name to her work or removing her name from her work. The cases are just legion that address this situation where something is an alleged derivative work, and here, as the court mentioned, they don't look anything alike. The allegation is it was used as a starting point, and the allegation is, well, if you use something as a starting point, you have to carry over the name that you used as a starting point, or that's a- If we don't want to decide the Ray Sanova issue on this, can we just decide the Sienter issue? You can, because if you- What would be your, like, sentence if you were writing the opinion? The sentence is they came forward with no evidence of Sienter, and moreover, the conduct was licensed, and there couldn't be any Sienter because it's, you have to have an intent to conceal a copyright violation, and there is no copyright violation, so there can be no intent to conceal. Thank you, Your Honor. Okay, thank you. Okay, Mr. Jumeau. Do you want to give your sentence of how you would write the opinion on the DMCA Sienter issue? If you intend the act, you intend the violation. DMCA requires a volitional act in circumstantial evidence supports or prevents summary judgment here because if the defendant made a copy or a derivative and didn't include my client's CMI or added false CMI, such as a copyright notice that says this is my work, that act is enough to supply a Sienter. As far as the statutory construction issue, Your Honor, yes, all of these cases are district court cases. We believe that the GC2 case from Northern District of Illinois and the Huffman v. Activision opinion from Magistrate Judge Payne are much more in line with this court's tradition of not adding terms to an unambiguous statute. And Judge Payne also did a textual analysis based on the definition of copies in the Copyright Act to conclude that it has to include more than just the original work. So the original work requirement that these other courts have engrafted on the statute is not supported by the text of the statute. I would like to direct the court on the express contract arguments that counsel made to page 5, and it's a bullet point that says, the third bullet point, the client agrees that changes to the architect's documentation, specification, or report are to be issued exclusively from the architect's office. Documentation in this contract is used on page 4, the second bullet point, to include regular design and construction documents. So we have an express prohibition on page 5, the same page where they find their ownership of documents argument for a license, that says, those changes to the construction and design documents are to be issued exclusively from the architect's office. Now, where were you, I see that, where were you keying back to? The previous page, the question would be, does documentation include the design and construction plans? Now, where are you saying, on page 4? On page 4, under additional optional services, the second bullet point uses the expression, regular design and construction documents. It's the only other place documents is used. So to read this contract together, which is required by Texas law, so that all terms have meaning, that's the explanation that says that the reference on page 5 about documentation includes design and construction documents, which are the plans that my client provided in schematic design form. Well, but that's only, it says that are required by government or neighborhood agencies. On page 4, Your Honor? Drawing format and content other than that of regular design and construction documents, as historically completed by architect, that may be required by governmental or neighborhood agencies. And what we see, Your Honor, is if you're trying to construe the contract as a whole, and you want to know what documentation means, you look for how the word documents or documentation is used elsewhere. But if that were as broad as he said, then your client would have a bigger argument that she was entitled to do the further phases of the project. If they reached agreement on that compensation. Which they never did. Which they never did. The issue, though, Your Honor, and I think there's a feeling on the Court, and there certainly was in the Shaver case, that once you start down the slope of providing a schematic design, you've given up all rights as an architect to all other. No, I think the feeling may be that if you want to protect your rights as the architect, then you say this shall not be used further without express permission and payment of a license. But the problem, Your Honor, is if you have that copyright, you don't need to reserve the copyright in a contract. We have the same situation in cases that we briefed. The Manners case said the right to perform a play did not include the right to turn that play into a movie. Durkin v. Platts, the Northern District of Georgia case, said the right to prepare a screenplay for a movie. Do you agree if we conclude it's ambiguous, we have to construe it against your client? Absolutely not. May I answer, Your Honor, because I'm out of time? I had another question, but I can't remember. May I answer? Sure. This Court in the Geophysical v. TBS, whatever, NOPEC case quoted SOS v. Payday from the Ninth Circuit. That case said the exact rule that contracts are construed against the drafter was not given effect based on federal copyright policy that a license only conveys the subject matter that is licensed and doesn't and actually prohibits all other conduct. So that rule about construed against the drafter according to the Ninth Circuit is not applied to say that an architect has to reserve rights. So you're basically saying Lularama is wrong? Your Honor, we don't have to say Lularama. I think Lularama— You're saying Shaver is wrong. I'm saying Shaver doesn't apply to a Texas case because it's not Texas law. And Lularama, while I think that it was incorrect for the Court to say Texas law governs this and then cite a case from the Seventh Circuit under Indiana law for the standard, the Lularama case says the implied license here is on the 29 jingles that were prepared after the express license agreement had expired. So there we didn't have an express contract that covers the subject matter. Here we absolutely do. Okay.  Thank you, Your Honor.